IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | 8:21CR307 |
| vs. | |
| KYLE MOORE, | FINDINGS AND RECOMMENDATION |
| Defendant. | |

This matter is before the Court on Defendant's Motion to Suppress (Filing No. 17). An evidentiary hearing was held regarding the motion on August 23, 2022. A transcript has been filed and the motion is now ripe for disposition. For the reasons set out below, the undersigned will recommend that the motion be denied.

**FACTS**

On November 28, 2021, Omaha Police Officer Daniel Cleveland ("Officer Cleveland") was on duty responding to radio calls and conducting traffic stops in the northeast sector of Omaha. (TR. 7.) Officer Cleveland testified that he patrols the northeast sector frequently and is familiar with the area. (TR. 8-9.) Officer Cleveland testified that the northeast sector is patrolled frequently because it has the most violent crimes in Omaha, including gang shootings and narcotics trafficking. (TR. 8.) Officer Cleveland has been a police officer since December of 2016 and has been an Omaha police officer since May of 2021. (TR. 9; TR. 21-22.) Officer Cleveland has attended specialized training for narcotics investigations and has made over 300 felony narcotic arrests in his career. (TR. 21-22.)

At approximately 4:30 a.m. on November 28, Officer Cleveland conducted a traffic stop on a black Hyundai Sonata for an expired registration. (TR. 10.) The traffic stop occurred at around Florence Boulevard and Brown Street in Omaha. (TR. 10.) Officer Cleveland testified that at the time of the stop, it was cold and dark outside. (TR. 14.) The streetlights were still illuminating. (TR. 14.) Officer Cleveland was wearing a body-camera at the time of the stop. (Ex. 1.)

When Officer Cleveland approached the driver's side of the vehicle, the driver of the vehicle, who was later identified as Christian Lopez ("Lopez"), rolled down the driver's side window about a quarter of the way. (TR. 10-11; Ex. 1.) Officer Cleveland testified that only rolling the window down that far is uncommon in traffic stops. (TR. 10-11.) Officer Cleveland stated this is usually indicative of criminal behavior. (TR. 10-11.) Officer Cleveland told Lopez the reason for the stop and Lopez explained that the vehicle belonged to his girlfriend who was incarcerated in Utah. (TR. 11; Ex. 1.) Officer Cleveland testified that during this conversation, Lopez would periodically look at him, but most of the time Lopez looked forward and appeared to be avoiding eye contact. (TR. 11; Ex. 1.) Officer Cleveland testified that Lopez was pale in complexion and nervous at the time of the encounter. (TR. 11; Ex. 1.)

Officer Cleveland asked Lopez for his identification and testified that Lopez's hands appeared to be shaking as he was trying to get his ID out of his wallet. (TR. 12; Ex. 1.) Officer Cleveland stated that Lopez provided him an ID, but he could not recall whether it was a Nebraska identification card or an expired license. (TR. 13.) Officer Cleveland then asked Defendant, who was a passenger in the vehicle, for his identification. (TR. 10; TR. 12; Ex. 1.) Defendant told Officer Cleveland that all he had was a COVID vaccination card and then verbally provided Officer Cleveland with his name, date of birth, and address when asked for it. (TR. 12; Ex. 1.) Officer Cleveland stated he could not really see Defendant at that point because it was dark, but he did not note any nervousness from Defendant. (TR. 30.)

Officer Cleveland asked Lopez and Defendant where they were going, and Lopez responded they were going to see a friend. (TR. 13; Ex. 1.) Officer Cleveland then asked for the address, and Lopez said he did not know. (TR. 13; Ex. 1.) Officer Cleveland testified that he found their travel plans suspicious because Lopez did not mention a general area where they were going and he believed Lopez was being evasive about their travel plans. (TR. 13; Ex. 1.) Officer

2

Cleveland also testified that it was an odd hour for people to be out especially since it was very cold outside. (TR. 14.) Officer Cleveland stated that he also noticed the vehicle was cluttered and that there were two backpacks in the back seat. (TR. 15; Ex. 1.)

Officer Cleveland returned to his cruiser to complete the data checks on Lopez and Defendant. (TR. 15-16; Ex. 1.) Officer Cleveland testified that he learned Lopez did not have a valid driver's license. (TR. 16; TR. 18.) Officer Cleveland also confirmed the vehicle was not stolen but the registration was expired. (TR. 18.) Officer Cleveland testified that he noted Lopez was flagged as a gang member and a potentially violent offender. (TR. 16.) Officer Cleveland also stated that he noted Lopez had an extensive criminal history, which included narcotics and weapons offenses. (TR. 16.) From the data checks on Defendant, Officer Cleveland discovered Defendant was also flagged as a gang member and had an extensive criminal history that included firearms charges, violent offenses, and some narcotics offenses. (TR. 16.) Officer Cleveland could not recall at the hearing whether Defendant had a valid driver's license. (TR. 17.)

Officer Cleveland testified that once he determined Lopez and Defendant were flagged as gang members and had violent criminal histories, he decided to ask another officer to assist with the stop for safety purposes. (TR. 14-16.) Officer Cleveland used his cell phone to call Omaha Police Officer Jarid Freyermuth ("Officer Freyermuth") and asked him to come to the scene of the stop. (Ex. 1.) While he was performing the data checks, Officer Cleveland called for a K-9 unit. (Ex. 1.) Officer Cleveland testified that he called for a K-9 because he believed Lopez and Defendant were involved with criminal activity related to narcotics. (TR. 16.) Officer Cleveland testified he called for a K-9 at that point to expedite the process because there are usually only one or two K-9s available within Douglas County. (TR. 17.) Officer Cleveland testified that once dispatch confirmed the data checks, he began preparing a citation for Lopez on the computer inside his cruiser. (TR. 18-19.)

As Officer Cleveland was completing the data checks and citation, Officer Samantha Casey ("Officer Casey") arrived on the scene to assist with the stop. (TR. 15; TR. 18-19; Ex. 1.) When Officer Casey arrived, Officer Cleveland explained what was going on and what he was doing. (TR. 19; Ex. 1.) He told Officer Casey to be cautious because the individuals in the vehicle were gang members with violent criminal histories. (TR. 19; Ex. 1.)

3

Officer Cleveland completed the citation, printed it off, and explained to Officer Casey that he was going to remove Lopez from the car, perform a pat-down and ask for consent to search. (Ex. 1.) Officer Cleveland also told Officer Casey that he was going to remove Defendant from the vehicle, perform a pat-down on Defendant, while they were waiting for the K-9 unit to arrive. (Ex. 1.) Officer Cleveland returned to the Sonata on the driver's side and Officer Casey approached the Sonata on the passenger's side. (Ex. 1.) This occurred approximately twenty-four minutes into the stop. (Ex. 1.) Officer Cleveland asked Lopez to exit the vehicle and asked if he had any weapons. (TR. 19-20; Ex. 1.) Officer Cleveland testified that whenever he issues a citation, he always asks the driver out of the vehicle for safety reasons and because he likes to use the hood of his cruiser as a writing surface. (TR. 19.) Officer Cleveland testified that it is also easier to get a person's fingerprints at the hood of his cruiser. (TR. 19.)

Officer Cleveland testified that given Lopez's criminal history, nervousness, and everything that was happening, he believed there was a possibility Lopez could be armed so he performed a pat-down on Lopez. (TR. 20.) As he was competing the pat-down, Officer Cleveland told Lopez that Officer Casey saw an open bottle of alcohol in the vehicle. (TR. 20; Ex. 1.) Officer Cleveland testified this observation was significant because possessing an open alcohol container in a vehicle is a misdemeanor offense and, in his experience, if there is one open container, there are usually more, and it could be related to driving under the influence. (TR. 20.) Officer Cleveland testified that he did not suspect Lopez was intoxicated when he was seated in the vehicle because Lopez's window was only partially down, which could have impacted his ability to detect odors coming from the vehicle. (TR. 20.) Officer Cleveland asked Lopez if he had been drinking while he was patting him down and Lopez ultimately stated he had not been drinking. (Ex. 1.) Officer Cleveland testified that he did not smell the odor of marijuana. (TR. 29.) Around the time this was occurring, Sarpy County K-9 handler Illuzzi ("Deputy Illuzzi") arrived on the scene. (TR. 23; Ex. 1.) Omaha Police Officer Russell Verbe ("Officer Verbe") and Officer Freyermuth also arrived on the scene. (TR. 26; Ex. 1.)

After Lopez was patted-down, Officer Cleveland directed Lopez to stand next to Officer Verbe near the rear of the vehicle. (Ex. 1.) Defendant was then removed from the vehicle and patted-down. (TR. 33; Ex. 1.) Defendant was compliant and nothing concerning was found on Defendant's person. (TR. 33; Ex. 1.) Defendant engaged in small talk with Officer Cleveland

4

during this process about a lottery ticket and Officer Cleveland did not perceive any nervousness on the part of Defendant. (TR. 34; Ex. 1.) Once the pat-down was complete, Officer Cleveland told Defendant to stand back between the cruiser and the Sonata. (TR. 34.)

Officer Cleveland testified he told Lopez and Defendant that they were detained at that point. (TR. 35.) However, Officer Cleveland's body camera does not reflect that Officer Cleveland told them they were detained at that time. (Ex. 1.) Once Lopez and Defendant were standing at the back of the vehicle, Officer Cleveland asked Officer Casey where the open container was located, and Officer Cleveland opened the back passenger-side door of the vehicle and briefly pointed his flashlight inside. (Ex. 1.) Officer Cleveland then went to speak to Deputy Illuzzi and told her what was going on. (TR. 23; Ex. 1.)

Following his brief discussion with Deputy Illuzzi, Officer Cleveland retrieved the open container from the vehicle, which turned out to be a half-full bottle of malt liquor. (TR. 21; Ex. 1.) The container was located on the rear passenger floorboard just under the seat. (Ex. 1.) Officer Cleveland searched the immediate areas of the vehicle that either Lopez or Defendant could access or conceal an open container. (TR. 21; Ex. 1.) Officer Cleveland testified he looked under the seats, between the seats, and in the door pocket. (TR. 21; Ex. 1.) Officer Cleveland stated that when he looked under the driver's seat, he saw a bag that contained several hundred unused self-sealed baggies that were roughly 2 inch by 2 inch in size. (TR. 21; Ex. 1.) Officer Cleveland testified that based on his training and experience, he knew those types of bags were commonly used to package illegal narcotics for resale and that the amount located was consistent with those involved in drug distribution, not just casual use. (TR. 21-22.) This search of the vehicle occurred approximately thirty minutes into the traffic stop. (Ex. 1.)

After Officer Cleveland conducted the search and found the open container and the baggies, he asked Lopez for his consent to search. (TR. 23; Ex. 1.) (TR. 23; Ex. 1.) Lopez denied consent. (Ex. 1.) Officer Cleveland then asked Lopez if he would be willing to allow a K-9 to do an exterior sniff of the vehicle and Lopez said no. (TR. 23; Ex. 1.) Officer Cleveland testified that it is the policy of the Omaha Police Department to ask occupants of vehicles for consent prior to running drug dogs around vehicles. (TR. 23.) Officer Cleveland then told Lopez and Defendant they were being detained, and that the K-9 was going to be run around the vehicle. (Ex. 1.) Deputy Illuzzi went to retrieve her K-9. (Ex. 1.) Lopez and Defendant were asked to stand towards the

side of the road near the back of the vehicle. (Ex. 1.) The K-9 then sniffed the outside of the vehicle and alerted to the presence of narcotics. (TR. 23; Ex. 1.) The dog sniff began approximately two minutes after Lopez denied consent. (TR. 23; Ex. 1.)

Following the dog sniff, Deputy Illuzzi told Deputy Cleveland that the K-9 had alerted. (Ex. 1.) Deputy Cleveland informed Lopez and Defendant that there was probable cause to search the vehicle and that a search was going to be conducted. (TR. 24; Ex. 1.) Lopez was handcuffed and placed in a cruiser. (Ex. 1.) Defendant was also placed in a cruiser, but he was not placed in handcuffs. (Ex. 1.) Deputy Cleveland testified that at this point, it was plausible that both Lopez and Defendant were involved and aware of the criminal activity together as a partnership. (TR. 41.)

The officers began this search of the vehicle around thirty-seven minutes into the stop. (Ex. 1.) The officers located a backpack in the rear of the vehicle on the driver's side. (TR. 25; Ex. 1.) That bag was later discovered to belong to Lopez. (TR. 25.) The bag contained a used methamphetamine pipe. (TR. 25.) There was also a used, broken methamphetamine pipe near the front stereo column of the vehicle in a small compartment. (TR. 25; Ex. 1.) There was a flip-open change compartment in the dash to the left of the steering wheel with five bags of methamphetamine. (TR. 25; Ex. 1.) In the rear passenger seat, there was a backpack, with an empty glock magazine and ammunition. (TR. 25; Ex. 1.) Officer Cleveland also found a vaccination card with Defendant's name on it in the backpack. (TR. 25; Ex. 1.) Officer Cleveland testified that at the time the K-9 sniff occurred or when it was completed, he did not know who the backpacks in the rear of the vehicle belonged to. (TR. 24.) Officer Cleveland testified that other officers later told him that Defendant said the backpack with the ammunition belonged to him. (TR. 26.)

Lopez was arrested for possession with intent to distribute methamphetamine. (TR. 36; Ex. 1.) Defendant was not arrested and was allowed to leave. (TR. 36; Ex. 1.) Approximately ninety minutes elapsed from the time the traffic stop began to the point Defendant was allowed to leave. (Ex. 1.) Defendant was permitted to drive the Sonata away from the scene even though he did not have a driver's license in his possession. (TR. 37.) Officer Cleveland testified he made the decision to allow Defendant to leave and stated it was a discretionary decision as to whether to allow Defendant to drive the vehicle from the scene. (TR. 43.) Officer Cleveland testified he did

not believe he had authority to arrest Defendant for being a felon in possession of ammunition because it is only a federal offense and there was not a federal agent present. (TR. 42.)

A two-count federal indictment charging Defendant with being a felon in possession of ammunition was filed on December 14, 2021. (Filing No. 1.)

### DISCUSSION

Defendant does not challenge the legality of the initial traffic stop. *See United States v. Gadson*, 670 F. App'x 907, 908 (8th Cir. 2016) (quotation omitted) ("Any traffic violation, however minor, provides probable cause for a traffic stop."). Instead, Defendant argues there was no reasonable suspicion to detain him for the K-9 sniff. Although Defendant, as the passenger in the vehicle, does not have standing to contest the search of the vehicle, he may contest the lawfulness of his own detention and seek to suppress evidence as the fruit of the illegal detention. *United States v. Green*, 275 F.3d 694, 699 (8th Cir. 2001).

"An officer may detain the occupants of a vehicle while completing routine tasks related to the traffic violation, such as asking for license and registration or inquiring about the occupants' destination, route, and purpose." *United States v. Chartier*, 772 F.3d 539, 543 (8th Cir. 2014). Once the purpose of an initial traffic stop is complete, an officer cannot further detain the vehicle or its occupants unless something occurs during the traffic stop that generates the necessary reasonable suspicion to justify a further detention. *See United States v. Beck*, 140 F.3d 1129 (8th Cir. 1998). Absent reasonable suspicion, an officer may not broaden the investigation "beyond the time reasonably required to complete the mission of issuing a warning ticket." *Rodriguez v. United States*, 135 S.Ct. 1609, 1615 (2015) (quotation omitted).

Reasonable suspicion exists if an officer is aware of "particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime is being committed." *Beck*, 140 F.3d at 1136 (quotation omitted). "Whether the particular facts known to the officer amount to an objective and particularized basis for a reasonable suspicion of criminal activity is determined in light of the totality of the circumstances." *United States v. Garcia*, 23 F.3d 1331, 1334 (8th Cir. 1994). "Whether such suspicions are reasonable is assessed from the point of view of trained law enforcement officers based on the totality of the

7

circumstances known to the officers at the relevant time." *United States v. Zamora-Lopez,* 685 F.3d 787, 790 (8th Cir. 2012).

As part of the traffic stop, Officer Cleveland performed several routine tasks related to the stop. He approached the vehicle, asked for the occupants' identification, and asked Lopez about their travel itinerary. Officer Cleveland then returned to his cruiser to run background checks and complete the citation. These were all permissible, routine tasks related to the traffic stop and there is no indication that Officer Cleveland prolonged the time to complete these tasks to allow the K-9 to arrive. *See United States v. Olivera–Mendez,* 484 F.3d 505, 510 (8th Cir.2007) ("Whether a particular detention is reasonable in length is a fact-intensive question, and there is no per se time limit on all traffic stops."). Around twenty-four minutes into the stop, Officer Cleveland printed the citation, returned to the Sonata, and asked Lopez to step out of the vehicle.

Officer Cleveland testified that whenever he issues a citation, he asks the driver out of the vehicle for safety reasons and because he likes to use the hood of his cruiser as a writing surface and to take fingerprints. This practice is lawful as it is well-established that an officer may ask occupants of vehicles to exit the vehicles during a traffic stop. *Pennsylvania v. Mimms*, 434 U.S. 106, 111 (1977) ("[O]nce a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures"); *Maryland v. Wilson*, 519 U.S. 408, 414 (1997) ("[A]n officer making a traffic stop may order passengers to get out of the car pending completion of the stop"). After Lopez exited the vehicle and was being patted-down,[1] Officer Casey observed the open container of alcohol. At that time, the citation had not been signed and the tasks related to the traffic stop had not been completed.

Defendant argues Officer Cleveland made the decision to detain him before the open container was observed and he did not have reasonable suspicion to do so. Defendant points to the

---

[1] It is well-established that during a routine traffic stop, police officers "may order out of a vehicle both the driver and any passengers [and] perform a 'patdown' of a driver and any passengers upon reasonable suspicion that they may be armed and dangerous." *Knowles v. Iowa,* 525 U.S. 113, 118, 119 S.Ct. 484, 142 L.Ed.2d 492 (1998). Under the facts of this case, there was reasonable suspicion to believe Lopez and Defendant were armed and dangerous. It was 4:30 a.m., it was dark outside, and the traffic stop occurred in a high crime area. Officer Cleveland was also aware that Lopez and Defendant were flagged gang members with extensive criminal histories, which included narcotics and weapons offenses.

body camera footage which recorded a conversation between Officer Cleveland and Officer Casey in which Officer Cleveland explained to Office Casey that he was going to remove the occupants from the car, perform pat-down searches, ask for consent to search, as they were waiting for the K-9 unit to arrive. Despite this possible plan of action, the fact of the matter is that before the purpose of the stop had been completed Officer Casey observed the open container of alcohol in the vehicle which provided probable cause for the search of the vehicle. *See United States v. Neumann*, 183 F.3d 753, 756 (8th Cir. 1999) (finding search of defendant's vehicle was justified by probable cause to believe further evidence of an open container violation would be discovered). At the point when Defendant was removed from the vehicle, Deputy Cleveland did not know who the open container belonged to.

After Lopez and Defendant were removed from the vehicle, Officer Cleveland retrieved the open container from the vehicle, which turned out to be a half-full bottle of malt liquor. He also searched the immediate areas of the vehicle that either Lopez or Defendant could access or conceal an open container. Officer Cleveland looked under the driver's seat and saw a bag that contained several hundred unused self-sealed baggies. Officer Cleveland testified that based on his training and experience, he knew those types of bags were commonly used to package illegal narcotics for resale. Officer Cleveland then asked Lopez for his consent to search the vehicle, which was denied. As a matter of protocol, he also asked Lopez if he would be willing to allow a K-9 to do an exterior sniff of the vehicle and Lopez said no. At that point, Officer Cleveland told Lopez and Defendant they were detained, and that the K-9 was going to be run around the vehicle.

At the time of the K-9 sniff, there was reasonable suspicion to detain Defendant. Officer Cleveland was on patrol at 4:30 a.m. in an area that he knew was considered a high crime area. When Officer Cleveland approached the vehicle, Lopez only rolled down the driver's side window a quarter of the way, which Officer Cleveland testified was uncommon and usually indicative of criminal behavior. Although Officer Cleveland did not detect any nervousness on Defendant's part, he testified that Lopez appeared pale, nervous and was avoiding eye contact. Office Cleveland also believed they were being evasive about their travel plans because Lopez told him they were going to see a friend but did not know the address or indicate a general direction they were headed. These circumstances all support a finding of reasonable suspicion. *See United States v. Atlas*, 94 F.3d 447, 450-51 (8th Cir. 1996) (finding reasonable suspicion where the defendant

9

was located in high-crime neighborhood, appeared very nervous, and gave evasive answers); *United States v. Stewart*, 631 F.3d 453, 457-58 (8th Cir. 2011) (finding that defendant's presence at night in a high-crime area supported reasonable suspicion).

Officers were also aware that Defendant was a flagged gang member with an extensive criminal history that included firearms charges and some narcotics offenses. *See United States v. Roelandt*, 827 F.3d 746, 748-49 (8th Cir. 2016) (finding reasonable suspicion where officer knew defendant was a felon and gang member and officers observed defendant walking quickly through a high-crime area and suspiciously looking around); *United States v. Cornelius*, 391 F.3d 965, 967 (8th Cir. 2004) (considering, on reasonable suspicion to stop, officers' knowledge of defendant's gang and narcotics affiliations). Additionally, an open alcohol container had been found in the vehicle, along with several hundred unused self-sealed baggies which Officer Cleveland knew, based on his training and experience, were commonly used to package illegal narcotics for resale. Officer Cleveland did not know who those bags belonged to at the time the K-9 search began. Based on the totality of circumstances, there was reasonable suspicion to detain Defendant for the K-9 sniff and search.

Accordingly,

**IT IS HEREBY RECOMMENDED** to United States District Court Judge Brian C. Buescher that Defendant's Motion to Suppress (Filing No. 17) be denied.

Dated this 24th day of October, 2022.

BY THE COURT:

s/ Susan M. Bazis
United States Magistrate Judge

### ADMONITION

Pursuant to NECrimR 59.2, any objection to this Findings and Recommendation shall be filed within fourteen (14) days after being served with a copy of this Findings and Recommendation. Failure to timely object may constitute a waiver of any such objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.